UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| KRISTINE K. AL KHUZAIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:14-cv-00199-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Carolyn W.* | ) | |
| *Colvin, Acting Commissioner of* | ) | |
| *Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Kristine K. Al Khuzaie appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Al Khuzaie applied for DIB and SSI in 2005, alleging disability as of December 20,

2003, which she later amended to July 2, 2005.  (AR 14, 71-75, 1191).  Her DIB-insured status

expired on December 31, 2010 (AR 14), so with respect to her DIB application, she must show

that she was disabled on or before that date.  *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th

Cir. 1997).  The Commissioner denied Al Khuzaie's application initially and upon

reconsideration.  (AR 14, 51-59).  After a hearing, Administrative Law Judge Terry Miller ("the

---

[1] All parties have consented to the Magistrate Judge.  (DE 13); *see* 28 U.S.C. § 636(c).

ALJ") rendered an unfavorable decision on June 5, 2009, denying Al Khuzaie benefits. (AR 14-25). The Appeals Council denied Al Khuzaie's request for review (DE 1295-1302), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Al Khuzaie filed suit in this Court, and on March 5, 2012, the Court reversed and remanded her case for further proceedings. (AR 1258-73, 1293-94). The Appeals Council then remanded the case back to the ALJ and consolidated it with new DIB and SSI claims that Al Khuzaie had filed in the meantime. (AR 1253-56, 1321-27, 1991-93, 1996-2004). On November 20, 2012, a second hearing was held before the ALJ, at which Al Khuzaie, who was represented by counsel, and vocational expert Joseph L. Thompson ("the VE"), a different vocational expert than at the first hearing, testified. (AR 2030-2100). On May 15, 2013, the ALJ issued a second unfavorable decision denying Al Khuzaie benefits. (AR 1191-1224). The Appeals Council denied Al Khuzaie's request for review, making the ALJ's decision the final decision of the Commissioner. (AR 1177-79).

On July 2, 2014, Al Khuzaie filed suit in this Court, appealing the Commissioner's denial of benefits. (DE 1). She asserts that the ALJ erred in three ways: (1) improperly evaluating the opinion of her treating psychologist, Dr. Revathi Bingi; (2) improperly evaluating the opinions of the state agency psychologists; and (3) relying on the testimony of the VE for the number of jobs cited at step five where such testimony purportedly lacked a proper foundation.

## II. FACTUAL BACKGROUND

### A. Background

At the time of the ALJ's second decision on May 15, 2013, Al Khuzaie was 44 years old

(AR 71, 1207); had a ninth grade education (AR 90); and possessed past work experience as a

fast food services manager, cashier, certified nursing assistant, deli worker, and waitress (AR

1392). She alleges disability due to "chronic lower back pain; diabetes; obesity; major

depressive disorder; anxiety disorder/panic disorder/post traumatic stress disorder; and

dependent personality disorder." (DE 18 at 3).

*B. Relevant Medical Evidence*

The parties both note the lengthy administrative record (2,100 pages) in this matter and,

rather than including a summary of the relevant medical evidence in their briefs, refer the Court

to the detailed summary of the medical evidence set forth in the ALJ's decision. (DE 18 at 3;

DE 25 at 2). Consequently, the Court will discuss the relevant medical evidence during its

analysis of the parties' arguments, referring to the summary of the medical evidence articulated

by the ALJ (AR 1194-1220) as needed.

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The

Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[2] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

An extra analytical step is needed if there is medical evidence of substance abuse or alcoholism. 20 C.F.R. §§ 404.1535, 416.935. If the Commissioner finds the claimant is disabled and there is medical evidence of drug addiction or alcoholism, the Commissioner must determine whether the claimant's drug addiction or alcoholism "is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535, 416.935. An affirmative answer leads to a finding that the claimant is not disabled. 20 C.F.R. §§ 404.1535, 416.935; *see Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." (citations omitted)).

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

*B. The Commissioner's Final Decision*

On May 15, 2013, the ALJ issued the decision that ultimately became the

Commissioner's final decision.  (AR 1191-1224).  The ALJ noted at step one of the five-step

analysis that Al Khuzaie had not engaged in substantial gainful activity since her amended

alleged onset date of July 2, 2005.  (AR 1194).  At step two, the ALJ found that Al Khuzaie had

the following severe impairments: chronic lower back pain, likely degenerative in nature, status

post interventional pain management treatment; diabetes mellitus; obesity; major depressive

disorder, anxiety disorder/panic disorder, PTSD, and dependent personality disorder; and

polysubstance dependence (history of alcohol, cocaine, and prescription narcotics).  (AR 1194).

At step three, the ALJ concluded that Al Khuzaie did not have an impairment or

combination of impairments severe enough to meet or equal a listing.  (AR 1196).  Before

proceeding to step four, the ALJ determined that Al Khuzaie's symptom testimony was not fully

credible (AR 1203), and he assigned her the following RFC:

> [T]he claimant has the [RFC] to perform less than the full range of light work . . .
> .  Her capacities for the full range are reduced in that she is limited to occasional
> climbing of ramps and stairs, balancing, stooping, kneeling, crouching and
> crawling and can never climb ladders, ropes, or scaffolds.  Otherwise, she can lift
> and/or carry ten pounds frequently and twenty pounds occasionally and sit or
> stand/walk, in combination, for six hours during an eight-hour workday.  With
> respect to her work environment, she needs to avoid concentrated exposure to
> wetness and hazards (i.e. operational control of moving machinery, unprotected
> heights, and slippery, uneven, moving surfaces).  The claimant retains the mental
> [RFC] to interact with others, including supervisors, co-workers, and the general
> public on a casual and superficial basis.  She cannot tolerate a work situation that
> involves large numbers of people.  However, for the period from July 2, 2005
> until December 18, 2009, due to the claimant's primary problem with poly-
> substance abuse, she lacked the capacity to maintain attention and concentration
> for even simple, repetitive, and routine tasks.

(AR 1199).  Based on this RFC and the VE's testimony, the ALJ concluded at step four that Al

Khuzaie could not perform any of her past relevant work, and at step five, that there were no jobs that existed in significant numbers that Al Khuzaie could perform. (AR 1207).

The ALJ further found that if Al Khuzaie stopped the substance abuse, she would continue to have a severe impairment or combination of impairments. (AR 1208). The ALJ then concluded that if Al Khuzaie stopped the substance abuse, she did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 1208). The ALJ then assigned Al Khuzaie the following RFC:

> The claimant has the [RFC] to perform light work . . . . Her capacities for the full range are reduced in that she is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling and can never climb ladders, ropes, or scaffolds. Otherwise, she can lift and/or carry ten pounds frequently and twenty pounds occasionally and sit or stand/walk, in combination, for six hours during an eight-hour workday. With respect to her work environment, she needs to avoid concentrated exposure to wetness and hazards (i.e. operational control of moving machinery, unprotected heights, and slippery, uneven, moving surfaces). If the claimant had not abused substances from July 2, 2005 to December 18, 2009, she would still lack the mental [RFC] to understand, remember, and carry out detailed or complex tasks. However, she would retain the capacity to perform simple, repetitive tasks on a sustained basis (meaning eight hours a day/five days a week or an equivalent work schedule). She could not work at a fast-pace or perform work that required a regimented pace of production. Socially, she could have tolerated only casual/superficial interactions with others, including supervisors, co-workers, and the general-public and could not have tolerated a work situation that involved large numbers of people.

(AR 1209). The ALJ concluded that if Al Khuzaie had not abused substances, she was still unable to perform any of her past relevant work. (AR 1220). The ALJ further concluded that considering Al Khuzaie's age, education, work experience, and RFC, if Al Khuzaie had stopped abusing substances, there would be a significant number of light work jobs in the national economy that she could perform, including folder (3,000 jobs state-wide and 60,000 jobs nationally), cleaner (5,000 jobs state-wide and 130,000 jobs nationally), and production

inspector (3,000 jobs state-wide and 30,000 jobs nationally). (AR 1221).

The ALJ found that from July 2, 2005, through December 18, 2009, a substance abuse disorder was a contributing factor material to the determination of disability because Al Khuzaie would not have been disabled if she stopped the substance abuse. (AR 1223). Therefore, Al Khuzaie's claims for DIB and SSI were denied. (AR 1223-24).

*C. Substantial Evidence Supports the ALJ's Assigning "Little Weight" to Dr. Bingi's Opinion*

Al Khuzaie argues that the ALJ's decision to assign "little weight" to the letter written by Dr. Bingi, her treating psychologist, on October 22, 2008, is not supported by substantial evidence. Contrary to Al Khuzaie's assertion, the ALJ's consideration of Dr. Bingi's opinion, though imperfect, is adequately supported.

1. Applicable Law

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, this principle is not absolute, as "[a] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment relationship; (3) how much supporting

evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner.  20 C.F.R. §§ 404.1527(c), 417.927(c); *see Books*, 91 F.3d at 979.  An ALJ

must "minimally articulate his or her justification for rejecting or accepting specific evidence of

a disability."  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted).

    2.  Summary of Dr. Bingi's Letter Dated October 22, 2008

    Dr. Bingi saw Al Khuzaie approximately 34 times over a five-year time frame extending

from February 2004 to October 2008.  (AR 1210; *see* AR 732-69, 825-53, 867-906, 927-29,

1000-04, 1025-24).  On October 22, 2008, Dr. Bingi wrote a three-page letter to Al Khuzaie's

attorney, answering certain questions posed by the attorney.  (AR 927-79).

    Dr. Bingi wrote that it had been a challenge to treat Al Khuzaie, as she had numerous no-

shows and last minute cancellations. (AR 927).  Dr. Bingi stated that she had discharged Al

Khuzaie twice, the first time in August 2007 and recently again in September 2008, and had

referred her to other facilities that could provide her with more comprehensive care due to her

complex problems.  (AR 927).  Dr. Bingi stated that Al Khuzaie had recently returned to her, and

that she had encouraged Al Khuzaie to seek comprehensive care at Parkview Behavioral Health

based on the following reasons: (1) Al Khuzaie would often leave wrong call-back telephone

numbers, stating that she forgot her own telephone number; (2) she came in on the wrong days

for her appointments; (3) when she did appear at appointments, she appeared very drowsy,

would doze off, and would not focus well; she stated that the reason for her drowsiness was

having taken Xanax, which was prescribed by her family practitioner; (4) she reported

considerable stress in her life, including that her father was seriously ill, that a paying guest at her home caused her considerable distress, and that marital conflicts were worsening with her husband, who was purportedly volatile and abusive; (5) she was dealing with suicidal ideation; and (6) she had recently been incarcerated for shoplifting. (AR 927-28).

Dr. Bingi stated that Al Khuzaie had lost custody of her children in the past when she was using substances, but that from March to June 2008 she appeared to be coping comparatively better and was seeking psychiatric treatment. (AR 928). Dr. Bingi wrote that Al Khuzaie had reportedly not used substances since resuming counseling in March 2008. (AR 928).

Dr. Bingi, "[k]eeping the above factors in mind," then opined that Al Khuzaie's symptoms of extreme mood swings, extreme anger, poor sleep, and panic attacks were "severe," and that her symptoms of poor choices and decision making and poor memory were "moderate to severe." (AR 928). Dr. Bingi wrote that these symptoms interfered with Al Khuzaie's ability to work full time; that she did not appear capable of managing her life or maintaining a routine even without working; that she depended on her parents for various aspects of her life; and that she focused her energies on caring for her children because she had lost custody of them in the past. (AR 928). Dr. Bingi concluded that, based on her observations in therapy, Al Khuzaie's ability to work full time was "limited." (AR 929).

Finally, Dr. Bingi wrote that her opinion would not change even assuming that Al Khuzaie had stopped abusing drugs and alcohol, as most of the time that Al Khuzaie was in counseling, Dr. Bingi had helped her cope with issues unrelated to drug abuse. (AR 929). Dr. Bingi stated that Al Khuzaie's limitations from working were attributable to the symptoms and

circumstances described at the beginning of the letter.  (AR 929).

    3. <u>Analysis</u>

    The ALJ devoted six pages of his 34-page decision to consideration of Dr. Bingi's three-page opinion dated October 22, 2008.  (AR 1209-15).  While acknowledging that Dr. Bingi had a lengthy and frequent treating relationship with Al Khuzaie and that Dr. Bingi gave a lengthy explanation for her opinion, the ALJ decided to assign "little weight" to the opinion.  (AR 1214).  The ALJ gave three reasons for doing so: (1) Dr. Bingi "qualified" her opinion at the outset of the letter; (2) the opinion relates to a period when Al Khuzaie was abusing drugs and alcohol; and (3) the opinion was inconsistent with Dr. Bingi's own treatment records and the record as a whole.  (DE 1215).  Al Khuzaie challenges several aspects of these reasons in an effort to convince the Court that Dr. Bingi's opinion is entitled to greater weight.

    Al Khuzaie first argues that the ALJ incorrectly found that the Global Assessment of Functioning ("GAF") score of 50 assigned by Dr. Wayne Von Bargen, a psychologist who examined Al Khuzaie in April 2008, was inconsistent with Dr. Bingi's opinion of severe and moderate-to-severe limitations.[3]  (AR 863, 1214).  Indeed, the ALJ mistakenly stated at one point that a GAF score of 50 is reflective of a moderate impairment in social, occupational, or school functioning.[4]  (AR 1212).  Actually, a GAF score of 51 to 60 reflects a moderate impairment,

_____

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  "The American Psychiatric Association no longer uses the GAF as a metric."  *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)).  However, the medical sources of record used GAF scores in assessing Al Khuzaie, so they are relevant to the ALJ's decision.  *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

[4] However, in another paragraph of the decision, the ALJ correctly articulated that a GAF score of 50 is reflective of a severe impairment.  (AR 1213).

while a GAF score of 41 to 50 reflects a severe impairment. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). As such, the ALJ incorrectly found that the GAF score of 50 assigned by Dr. Wayne Von Bargen was inconsistent with Dr. Bingi's opinion of severe and moderate-to-severe findings. (AR 1214).

But the ALJ's statement concerning Dr. Von Bargen's GAF score of 50 was just one purported inconsistency highlighted by the ALJ. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (affirming the ALJ's decision despite errors because none of the errors affected the outcome). The ALJ also observed that Dr. Bingi rated Al Khuzaie's GAF score at 55 in both December 2005 and February 2006, at 60 in August 2006 (AR 733, 750, 757, 844), and that clinician A. Baker, in conjunction with Dr. Patel, assigned Al Khuzaie a GAF score of 55 in May 2006 (AR 823). (AR 1212). The ALJ observed that these GAF scores were all reflective of just a moderate mental impairment, contrasting with Dr. Bingi's October 2008 opinion of severe impairments. (AR 1212).

The ALJ additionally considered that there were significant gaps in Al Khuzaie's treatment with Dr. Bingi that undercut the persuasiveness of her opinion. (AR 1212). Specifically, the ALJ noted that Dr. Bingi assigned her lowest GAF score of 50 in August 2007 after Al Khuzaie returned from a nine-month gap in treatment. (AR 885-92, 1212). The ALJ found the timing of Al Khuzaie's visit noteworthy—it was the same day that AL Khuzaie had a court hearing to try to regain custody of her children, having lost custody due to smoking crack. (AR 885-92, 1212). The ALJ noted that Dr. Bingi recommended at that visit that Al Khuzaie get treatment for substance abuse. (AR 885-92, 1212).

The ALJ also found that Dr. Bingi's opinion was likely influenced by the "chaos and

significant situational stressors" in Al Khuzaie's life that were reflected in Dr. Bingi's treatment notes from March through June 2008, including Al Khuzaie's husband's own mental health issues. (AR 882-84, 1213). Dr. Bingi's therapy focused on Al Khuzaie's ability to cope with these situational stressors. (AR 1213). The ALJ additionally noted that Dr. Robert White, Al Khuzaie's psychiatrist, was adjusting her medications throughout this period. (AR 1213). Thus, as the ALJ accurately observed: "While Dr. Bingi's treatment records from March through June 2008 reflect symptoms typical of depression and panic disorder, they also reflect lots of chaos, significant situational stressors, and problems with medications." (AR 1214).

Furthermore, the ALJ considered that Dr. Bingi had "qualified" her opinion at the outset (AR 1210, 1215), a point that Al Khuzaie does not dispute. That is, before rendering her opinion, Dr. Bingi listed a host of factors that the reader was to "keep[] . . . in mind" about Al Khuzaie. (AR 928). These include that Al Khuzaie often left wrong call-back telephone numbers, which suggested to the ALJ that Al Khuzaie, for whatever reason, "was not forthright with Dr. Bingi." (AR 1210). The ALJ also observed that Dr. Bingi referenced the "presence of considerable stress" in Al Khuzaie's life, including her father's serious illness, distress over a guest in her home, marital conflict, her husband's mental illness, and her recent incarceration for shoplifting. (AR 927, 1210).

Another factor listed by Dr. Bingi was Al Khuzaie's presentation at appointments as drowsy, dozing off, and unfocused. (AR 927). The ALJ found "this presentation [was] particularly noteworthy in the context of the claimant's abuse of substances." (AR 1210). The ALJ then reviewed many instances in the record of Al Khuzaie's abuse of substances from 2005 through at least December 2009. (AR 1212). As such, the ALJ observed that Dr. Bingi's

assessment encompassed the period in which Al Khuzaie was actively abusing substances such as cocaine and alcohol.  (AR 1211).  Specifically, the ALJ reasoned:

> [A]ll the symptoms that Dr. Bingi assessed as "severe" and "moderate to severe" were taking place during the period the claimant was abusing cocaine, alcohol, and/or narcotic pain medications, which no doubt would enhance/distort her symptoms, and, in turn, call into question [] Dr. Bingi's assessment that they were "severe" and "moderate to severe."

(AR 1212).

Al Khuzaie does not dispute the ALJ's finding that she abused substances from 2005 through at least the end of 2009, which includes the period in which Dr. Bingi assessed her symptoms as severe and moderate to severe.  She points out, however, that Dr. Bingi additionally opined that Al Khuzaie's mental problems would still be severe and would limit her ability to work full time even if she stopped abusing substances, and that most of the time, Dr. Bingi counseled Al Khuzaie on issues unrelated to drug abuse.  (AR 929).  She contends that the ALJ erred by not explicitly addressing this portion of Dr. Bingi's opinion.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (explaining that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

"While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision."  *Clifford*, 227 F.3d at 872 (citation omitted).  "Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion."  *Id*. (citations omitted).  In this particular instance, there is no doubt that the ALJ thoroughly considered Dr. Bingi's opinion, as he wrote six pages about it.  In doing so, the ALJ specifically acknowledged that "if either controlling weight or great weight were given to Dr. Bingi's

October 22, 2008, opinion, the claimant would be unable to work." (AR 1210). Thus, the ALJ *must* have considered Dr. Bingi's view that Al Khuzaie's symptoms would remain severe even if she stopped abusing substances; otherwise, the opinion—rendered during a time period in which Al Khuzaie was abusing substances—would not support a finding of disability. *See Kangail*, 454 F.3d at 628 ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." (citations omitted)); 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

Furthermore, the ALJ fairly applied the pertinent regulatory factors when determining that Dr. Bingi's opinion was not entitled to controlling or great weight, including the length of the treatment relationship and frequency of examination, the nature of the relationship, the supporting evidence provided, the consistency between the opinion and the record as a whole, and Dr. Bingi's specialty.[5] *See* 20 C.F.R §§ 404.1527(c), 416.927(c). Ultimately, the ALJ chose to apply greater weight to the medical source opinions of Dr. Mahender Surakanti, a psychiatrist who treated Al Khuzaie from 2009 through 2012, and Dr. Ken Lovko, a state agency psychologist who reviewed Al Khuzaie's record in December 2010. (AR 1215-20, 1656-672, 1857-61). These opinions were rendered after Al Khuzaie was released from prison in October 2010 and was no longer abusing substances. (AR 1215-20).

---

[5] When a treating physician has opined on an issues reserved for the Commissioner, the opinion is never entitled to controlling weight or given special significance, because doing so would abdicate the Commissioner's role to the treating physician. *See Dixon*, 270 F.3d at 1177, 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183 (July 2, 1996). Issues reserved to the Commissioner include statements that the claimant is "disabled" or "unable to work." *Dixon*, 270 F.3d at 1177; 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183, at *2.

The ALJ specifically noted that Dr. Surakanti had the benefit of evaluating Al Khuzaie not only in December 2009, when she was actively abusing substances and assessed a GAF score of 45 to 50, reflective of a severe impairment, but again in November 2010, after she had stopped abusing substances and was assessed a GAF score of 70 to 75, reflective of a mild or slight impairment. (AR 1216, 1860, 1878); *see* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). In contrast, Dr. Bingi treated Al Khuzaie only during the period when she was actively abusing substances. *See Clifford*, 227 F.3d at 879 ("We will always give good reasons . . . for the weight we give your treating source's opinion." (quoting 20 C.F.R. § 404.1527(d)(2)); *see generally Rice*, 384 F.3d at 371 (finding that "the ALJ satisfied his minimal duty to articulate his reasons and make a bridge between the evidence and the outcome").

The ALJ further observed that the opinion of Dr. Lovko was the "most recent assessment" from a state agency psychologist who had the benefit of reviewing Al Khuzaie's entire record. (AR 1215). "The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004) (citations omitted); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.").

"No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a

different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted); *see*

*Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("[W]e will not remand a case for further

specification when we are convinced that he ALJ will reach the same result." (citation omitted)).

Here, it is clear that the ALJ thoughtfully and thoroughly considered Dr. Bingi's opinion and, in

light of the record presented, there is no reason to believe that a remand might lead to a different

outcome. Consequently, the ALJ's consideration of Dr. Bingi's opinion will be affirmed.

### D. The ALJ Adequately Evaluated the Opinions of the State Agency Psychologists

Next, Al Khuzaie challenges the weight assessed by the ALJ to the opinions of the state

agency psychologists—Drs. Lovko, Joseph Pressner, J. Larsen, and Kenneth Neville—who

found that she could perform unskilled work. Specifically, Al Khuzaie argues that the ALJ

improperly relied on these doctors' opinions because they violated agency policy as set out in the

Program Operations Manual System (POMS) by opining that Al Khuzaie could perform

unskilled work. Al Khuzaie's second argument, however, also does not provide a basis to

remand the ALJ's decision.

Dr. Pressner reviewed Al Khuzaie's record in March 2008 and concluded that although

she had moderate difficulties with following detailed instructions and in sustaining concentration

and persistence, she could still perform simple, repetitive tasks in many work environments.

(AR 792-96). Dr. Pressner's opinion was affirmed by Dr. Neville in August 2006 and by Dr.

Larsen in May 2008. (AR 806, 852). In December 2010, Dr. Lovko reviewed Al Khuzaie's

record and found that although she had moderate difficulties with detailed tasks, in social

functioning, and in sustaining concentration and persistence, she could still perform unskilled

work without special considerations in many work environments. (AR 1672). Dr. Lovko opined

that Al Khuzaie's "primary difficulties appear related to episodes of substance abuse" and that "when [she] abstains, she does not show evidence of severe impairments." (AR 1672). Dr. Lovko concluded:

> Claimant can cooperate and tolerate the casual interactions necessary to perform tasks. [Claimant's symptoms] may result in some impediment to work situations which involve large numbers of people; but it does appear that [claimant] would be able to handle settings where there are fewer other persons in the work setting.

> The evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in many work environments. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. The claimant can attend to task for sufficient periods of time to complete tasks. The claimant can manage the stresses involved with unskilled work.

(AR 1672).

The ALJ found the opinions of the state agency psychologists "consistent with and well supported by the medical evidence." (AR 1215). The ALJ observed: "[T]he treatment records show that despite some 'ups and downs,' since her release from prison in October 2010, the claimant has overall responded to treatment and made steady progress with respect to her recovery from substance abuse." (AR 1218). The ALJ further considered that Dr. Lovko provided a detailed explanation for his opinion and that Dr. Lovko reviewed Al Khuzaie's allegations, daily activities, treatment, diagnoses, GAF ratings, and a third party report from the halfway house where the claimant was living. (AR 1220). Consequently, the ALJ ultimately assigned "great weight" to Dr. Lovko's opinion (AR 1216, 1219), as well as "significant weight" to the opinion of Dr. Surakanti, Al Khuzaie's treating psychiatrist from 2009 to 2012 (AR 1219).

Al Khuzaie, however, contends that the ALJ erred in crediting the state agency psychologists' opinions because the doctors violated POMS § DI 24510.065 when they opined

that she could perform unskilled work. *See* POMS § DI 24510.065, available at

https://secure.ssa.gov/apps10/poms.NSF/lnx/0424510065 (last visited March 17, 2016).

Specifically, POMS § DI 24510.065 states that when preparing a narrative statement for a mental

RFC assessment, a medical consultant should not offer an opinion as to "whether the individual

is disabled or whether the individual can or might perform or qualify for levels of work (e.g.

unskilled) or specific jobs (e.g., truck driver)." *Id.*

The POMS, however, is a document that guides Social Security employees on processing

disability claims. *Flint v. Colvin*, 543 F. App'x 598, 600 (7th Cir. 2013). As such, it "is for the

internal use of agency employees, has no legal force, and cannot bind the agency, let alone the

district court." *Id.* (collecting cases); *see Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) ("[T]he

Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it

is a 13-volume handbook for internal use by thousands of SSA employees . . . ."); *Pulley v.*

*Bowen*, 817 F.2d 453, 454 (7th Cir. 1987) ("The Secretary . . . never adopted that view in

implementing regulations, and therefore, the view expressed in the manual is not binding and

cannot be considered by this Court." (citations omitted)). Here, the ALJ properly analyzed and

weighed the opinions of the state agency psychologists in accordance with the regulations, *see*

20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), and his consideration of these opinions is supported

by substantial evidence. Any technical noncompliance with the POMS does not rise to the level

of reversible error. Consequently, Al Khuzaie's second argument does not merit a remand of the

ALJ's decision.

### E. The ALJ's Step-Five Finding Is Supported by Substantial Evidence

Finally, Al Khuzaie argues that the ALJ's determination at step five is not supported by

substantial evidence because the VE's testimony about the number of representative light, unskilled jobs upon which the ALJ relied lacked an adequate foundation. For the following reasons, Al Khuzaie's final argument is also unpersuasive.

1.    Applicable Law

As explained earlier, a plaintiff seeking DIB or SSI bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry; the burden then shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At this final step, the Commissioner must establish that the plaintiff's RFC allows her to engage in work found in significant numbers in the national economy. *Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009); 20 C.F.R. §§ 404.1520(f), 404.1566, 416.920(f), 416.966. One way the Commissioner may carry this burden is through the use of vocational expert testimony, provided that such testimony is reliable. *See Liskowitz*, 559 F.3d at 743; *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

The Seventh Circuit has "recognized that the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)); *see Liskowitz*, 559 F.3d at 743 ("The witness was testifying as a vocational expert, not as a census taker or statistician."). Yet, "because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable." *McKinnie*, 368 F.3d at 910; *see Donahue*, 279 F.3d at 446 ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." (citations omitted)); *see also Britton v. Astrue*, 521 F.3d 799, 803-04 (7th Cir. 2008). "If the basis of the

20

vocational expert's conclusions *is* questioned at the hearing, . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of [Federal] Rule [of Evidence] 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446.

Recently, the Seventh Circuit has expressed concern about the way in which vocational experts estimate the number of jobs in the economy that a particular claimant would be able to perform. *See Forsythe v. Colvin*, 813 F.3d 677, 680-81 (7th Cir. 2016); *Hill v. Colvin*, 807 F.3d 862, 870-71 (7th Cir. 2015) (Posner, J., concurring); *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Herrmann v. Colvin*, 772 F.3d 1110, 1113-14 (7th Cir. 2014); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). The Seventh Circuit summarized its concern as follows:

> The basic problem appears to be that the only reliable statistics concerning the number of jobs in the American economy and in regions thereof are census data of broad categories of jobs, rather than data on the number of jobs within the much narrower categories of jobs that the applicant for benefits could actually perform. Often the vocational expert simply divides the census data on the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the total number of narrow categories in the broad category, thus assuming that each narrow category has the same number of jobs—an unwarranted assumption.
>
> The vocational experts and administrative law judges can't be blamed for the poverty of the data concerning jobs that applicants for social security disability benefits are capable of performing. It is high time that the Social Security Administration turned its attention to obtaining the needed data.

*Forsythe*, 813 F.3d at 681. As at least one district court has observed, the Seventh Circuit "has not yet overturned an administrative law judge's denial of an appeal on that basis alone." *Brown v. Colvin*, No. 14-cv-894-bbc, 2015 WL 7294547, at *7 (W.D. Wis. Nov. 17, 2015) (concluding that it would make no sense to overturn the ALJ's decision based on the vocational expert's estimate of the number of jobs where the claimant was capable "of at least sedentary work and with none of the psychological problems that plagued the plaintiff in *Voigt* or the 'assemblage of impairments' that Ms. Herrmann suffered" (citing *Herrmann*, 772 F.3d at 1111)); *see also*

*Fitzgerald v. Colvin*, No. 15-cv-135-bbc, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016).

2.     <u>The VE's Testimony</u>

At the hearing, the VE testified that a hypothetical individual with Al Khuzaie's age, education, work experience, and RFC could perform the light, unskilled occupations of folder, 3,000 jobs state-wide and 50,000 nationally; cleaner, 5,000 jobs state-wide and 130,000 nationally; and production inspector, 3,000 jobs state-wide and 30,000 nationally. (AR 2088). Additionally, the VE testified that even if that same hypothetical individual were further limited to sedentary work, she could still perform the sedentary, unskilled jobs of assembler, 800 jobs state-wide and 24,000 nationally; bench worker, 900 state-wide and 12,000 nationally; and bonder, 1,000 state-wide and 15,000 nationally. (AR 2088-89).

Al Khuzaie's attorney then cross examined the VE about how he arrived at the estimates for the number of representative occupations:

Q     Okay. Now, well let's take the folder job that you cited. What information did you rely upon to come up with the numbers you did?

A     Basically, I took a look initially at the Bureau of Labor Statistics and obviously, that contained larger numbers of occupations and DOT codes based on those publications. I then took a look at information from census date, occupational outlook and cross-referenced the information and then took a look at the State of Indiana publication from sources such as Indiana Work Force and Business Research Center. I then went ahead and looked at the information through the Job Browser Pro[] software program. Looked at specific DOT codes and the industrial classification per those codes and based upon the previous reference materials, I then went ahead and it populates classifications according to the DOT code and the industrial classifications and came up with a number based upon a review of all that information.

Q     Okay. Well, I mean, did you start with the Job Browser Pro and then reduce based on the other information or?

A     I looked initially at Bureau of Labor Statistics, the broader category and then based upon information with the other resources, either added to or subtracted based upon the types of industries, the documentation, the description of the particular DOT code and position and then came up with a specific number.

Q      Okay. And now, the Bureau of Labor Statistics figures, do they have figures based upon specific DOT numbers and occupations?

A      No, they do not.

Q      Okay. So, what numbers do they give you that you used?

A      Well they will include, for instance or example, an assembler position. They won't identify various assembler positions and the numbers based upon specific DOT code. It just looks at assembler positions across all DOT titles.

Q      Okay. Now, so and likewise the folder would be in with other DOT titles?

A      In Bureau of Labor Statistics, that's correct.

Q      Okay, so how do you separate out which DOT jobs are identified? In other words, you have a category at the BLS that contains a number of DOT jobs and DOT numbers, corresponding certain DOT numbers, how to you separate out the number of jobs, you know, from those? Say you have, you know, a 100,000 with DOT title X, Y and Z, how do you separate those out then?

A      Well, some of that is certainly with Job Browser Pro, which outlines specific occupations per the number of occupations per DOT number. But, as far as how the final number comes up, it involves a cross-reference of all those materials, noting that obviously, the Bureau of Labor Statistics numbers is going to be the largest, but would not be the most accurate when you start defining it per DOT number. And, that review of those labor market research materials from the State of Indiana as well as federal, and then using the Job Browser Pro and assigning particular industries based upon that data then it does allow me to come up with a more specific type of clarification per DOT code.

Q      Well let me ask you this. Let's just take the folder job . . . . How did you reach the numbers on that one? I mean, can you, you know, how many in the BLS, what were the . . . numbers there?

A      Well typically, . . . the process would be the same for each occupation. . . . The results are different based upon the industries in a particular state and the documentation of what that review of the labor market information reveals. The folder position indicates, I believe, nationally over 400,000 types of occupations and obviously, that's not per that particular DOT code but it is basically whittled down, if you will, through that cross-reference of all those other materials and then using the Job Browser Pro, looking at industrial designations and then coming up with approximately 60,000 on a national basis based on that DOT code.

Q      Okay. Well, of the sources you stated, none of those give numbers by DOT title,

is that correct?

A       The only one that provides some clarification of that would be the Job Browser
        Pro but I don't use that specific number that it comes up with either because I
        review the other later market research and see where the industries per the state
        that I'm dealing with and nationally, and then come up with a number based on
        that research.  But you're correct.  The other resources do not deal with specific
        [INAUDIBLE] per DOT code.

Q       Okay, so how does the Census data give you information on whittling down these
        400,000 job[s] in which, you say, includes the folder?

A       Well there's that and the other resources allow me to see what are the various
        industries that are involved with the State of Indiana or any other state that I
        might be testifying regarding.  It allows me to see the population numbers
        themselves and a review of that later market data showing what is the makeup of
        the State of Indiana as one source in defining what those potential numbers may
        be based on the prevalence of, let's say, manufacturing versus healthcare versus
        transportation industries.

Q       Okay.  But if the 400,000 jobs you started with and are supposed to, you know,
        contain the, you know, various DOT jobs, I don't see where any of these that you
        have cited would separate out these jobs, the 400,000 jobs out into DOT numbers
        if none of them has information about the number of DOT jobs and that's specific
        in the folder area.

A       Well, what those other resources do is allow[] me to see the types of industries
        that are associated with a particular state or nationally and then it allows me to,
        when I utilize the Job Browser Pro, take a look at the industrial classifications and
        see where those may be appropriate or not as it relates to those industrial
        classifications.  So that then I can come up with a more appropriate number based
        upon that software program to identify the number of positions per DOT code.

Q       Okay.  Now, the Job Browser Pro as you said, does identify numbers per DOT
        code, am I correct on that?

A       It does and it does indicate that it's an estimate based upon . . . their research and
        validity and reliability of their resources as well.  But – –

Q       Right.  But that's a number that they produce and they don't, am I correct, they
        don't tell you what their methods are and how do you reach – – Well, they tell
        you some of it but they don't tell you all of it?

A       That's correct.

Q       I mean, you wouldn't be able to tell us exactly how they reach those numbers

because there's some things that they keep to themselves because it's – – They sell that, right?

A    Correct. Some of it's proprietary, I'm sure.

(AR 2091-97).

Al Khuzaie's attorney then objected to the VE's testimony, stating: "[W]here [the VE] starts with does not name DOT titles and codes and numbers and I don't think he's citing any information [that] would indicate that we would be able to sort out that information." (AR 2097). After this objection, the ALJ further questioned the VE:

Q    Mr. Thompson, kind of explain, is it [a] matter of for each and every job you cite is there different, you go through the same process or does it depend upon the information you gather from these publications that you have to kind of sort through it in a different way for each job?

A    Well each particular occupation is unique in itself, and based upon the various industries that may be associated with the State of Indiana or, the makeup nationally is less of an issue because obviously, that's going to remain the same. But the process is the same. Where it differs, however, is by reviewing that information and starting with those large sources and obviously, the Bureau of Labor Statistics is kind of the primary thing that everything is based on in any labor market research, then that information is valid in allowing me to see how the industries change and what the prevalence of those are so that information can be utilized in identifying industrial classifications for the software program of Job Browser Pro.

Q    But there's no formula saying, take these numbers, divide this by 2, multiply by 0.5 and this is the number I get, there's not formulation like that, is there?

A    There is no specific calculation to derive a number given that it's different for each occupation.

ALJ:    Okay. Okay. So Mr. Shull, you're going to provide that information, your objection, well a bit more specific basis for that?

Atty:    Yes, judge.

(AR 2097-98).

One month later, Al Khuzaie's attorney set forth his objection in writing to the ALJ,

arguing that "[t]he VE basically gave a list of sources that he used, but made no discernable explanation of how he reached those numbers." (AR 1396). The attorney asserted that, at most, the VE's testimony implies that he was "using his own experience" to arrive at the number of jobs, which was not enough to meet the standard under the Seventh Circuit case law. (AR 1396).

      3.     <u>Analysis</u>

In his decision, the ALJ thoroughly considered Al Khuzaie's objection challenging the reliability of the VE's testimony. (AR 1221-23). Ultimately, however, the ALJ was not persuaded by her arguments and overruled the objection. (AR 1223).

In discussing why he found the VE's testimony sufficiently reliable, the ALJ explained that the Social Security Administration must "take administrative notice of reliable job information available from various governmental and other publications" identified in 20 C.F.R. §§ 404.1566(d) and 416.966(d), which were the publications that the VE relied upon here. (AR 1222). These governmental publications included the DOT, published by the Department of Labor; Census Reports, published by the Bureau of the Census; and Occupational Outlook Handbook, published by the Bureau of Labor Statistics. Additionally, the VE relied upon publications by the Indiana Department of Work Force Development and the Indiana Business Research Center.

The ALJ then reviewed the VE's methodology for arriving at his estimated number of jobs, which involved using the aforementioned publications in conjunction with his own experience and Job Browser Pro software. (AR 1222-23). The ALJ discussed that the VE starts with a source that contains the largest number of jobs, the Bureau of Labor Statistics, which the VE acknowledged does not set forth numbers based on specific DOT codes. The ALJ further

observed that the VE, in order to deal with these limitations, compares that information with the Census Reports and the Occupational Outlook Handbook, as well as publications from the particular state in which he is testifying—in this instance, publications by the Indiana Department of Workforce Development and the Indiana Business Research Center. The ALJ then noted that the VE explained that this data, in particular, the census and labor market data, allow him to consider the state's population and the industries located there—for example, the prevalence of manufacturing versus healthcare versus transportation industries. The ALJ stated that the VE testified he also uses Job Browser Pro, a private software program that provides numbers of jobs available for specific occupations by DOT code; however, the VE does not solely rely on the numbers generated by the Job Browser Pro program, but considers them in conjunction with the other publications.

After summarizing the VE's methodology, the ALJ emphasized that the VE described the process of how he arrived at the number of jobs he cited and provided the information to the best of his ability as a vocational expert. (AR 1223). The ALJ emphasized that the VE is an expert in vocational placement and not a mathematician or statistician. In doing so, the ALJ rejected Al Khuzaie's argument that, because the VE could not articulate a specific formula that is peer-reviewed and reproducible, his opinion was not reliable. (AR 1223).

The Court agrees that, contrary to Al Khuzaie's assertion, the VE's testimony is sufficiently reliable in this particular instance. The ALJ relied on four different publications, he identified his sources with specificity, and several of the publications were governmental sources of which the ALJ was required to take administrative notice. 20 C.F.R. §§ 404.1566(d), 416.966(d); *see Liskowitz*, 559 F.3d at 744; *cf. Herrmann*, 772 F.3d at 1113 (finding the VE's testimony unreliable where he cited to only one public source, the DOT, as the basis for his

27

number of jobs).  Although he could have been more artful, the VE adequately explained his methodology, which entailed comparing several publicized governmental resources, analyzing the industrial make-up of the applicable state, and using Job Browser Pro to determine the number of specific jobs per industry, all through the lense of his own professional experience. *See Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009) (finding the VE's testimony was sufficiently reliable where it was based on the DOT, the Occupational Employment Quarterly, and his own experience).  As explained earlier, the Seventh Circuit has recognized that the standards by which an expert's reliability is measured are generally less stringent at an administrative hearing than under the Federal Rules of Evidence.  *McKinnie*, 368 F.3d at 910; *Donahue*, 279 F.3d at 446.

Notably, Al Khuzaie's attorney never requested a copy of the data that the VE relied upon, whether at the hearing or in a letter after the hearing.  *Cf. Duke v. Astrue*, No. 1:07-cv-188, 2008 WL 3992251, at *6 (N.D. Ind. Aug. 27, 2008) (finding that the data underlying the VE's bottom line testimony was not "available on demand" where claimant's attorney requested at the hearing and in a supplemental letter to review the data, but it was not produced); *Gaskill v. Astrue*, No. 1:08-cv-308, 2009 WL 3872056, at *6 (N.D. Ind. 2009) (same).  Nor did Al Khuzaie supplement the record after the hearing with contrary numbers, sources, or methodology.  *See Britton*, 521 F.3d at 804 (suggesting various methods that a claimant may use to challenge a VE's testimony).

Moreover, after the ALJ afforded Al Khuzaie's attorney the opportunity to cross examine the VE at length about her foundation, the ALJ also questioned the VE, at least to some extent, about the reliability of his conclusions.  The ALJ essentially confirmed through his questioning that while the VE applies this same process in each case, there is no one specific calculation or

formula that the VE can use to derive the number of jobs, as each occupation is unique. *Cf.*

*Polly v. Astrue*, No. 1:08-cv-158, 2009 WL 1766842, at *8 (N.D. Ind. June 23, 2009) (remanding

the ALJ's step five finding where the ALJ not only failed to make any inquiry into the reliability

of the VE's foundation, but he affirmatively prevented claimant's counsel from doing so). As

the Seventh Circuit articulated in *Forsythe*, "[t]he vocational experts and administrative law

judges can't be blamed for the poverty of the data concerning jobs that applicants for social

security disability benefits are capable of performing." 813 F.3d at 681.

On the record presented, there is no indication that Al Khuzaie's challenge to the VE's

methodology had any meaningful bearing on the outcome of the case. *See, e.g., Lawrence*, 337

F. App'x at 586; *Fitzgerald*, 2016 WL 447507, at *11; *Brown*, 2015 WL 7294547, at *7; *Dugan*

*v. Comm'r of Soc. Sec. Admin*., No. 2:10-cv-231, 2011 WL 2009465, at *8 (D. Vt. May 23,

2011). As such, it would not make sense to remand this case, which was initiated more than 10

years ago, for a second time, where the record shows that the claimant is capable—when she is

not abusing substances—of performing a limited range of light work in the jobs identified by the

VE. *See, e.g.*, *Fitzgerald*, 2016 WL 447507, at *11; *Brown*, 2015 WL 7294547, at *7.

Consequently, the Commissioner's final decision will be affirmed.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk

is directed to enter a judgment in favor of the Commissioner and against Al Khuzaie.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge